OPINION
{¶ 1} Todd Christopher Morgan was found guilty by a jury in the Montgomery County Court of Common Pleas of three counts of aggravated robbery, in violation of R.C. 2911.01(A)(1); one count of kidnapping, in violation of R.C. 2905.01(A)(2); two counts of kidnapping but releasing the victim in a safe place unharmed, in violation of R.C. 2905.01(A)(2), and two counts of rape, in violation of R.C. 2907.02(A)(2). Each of the eight counts included a firearm specification. The jury made unanimous written findings that Morgan had a firearm on seven of the eight counts. The trial court sentenced Morgan to nine years on the robbery counts, nine years on the kidnapping counts, and nine years on the rape counts, each to be served concurrently. The trial court, recognizing unanimous findings on all eight firearm specifications, merged the firearm specifications and sentenced Morgan to three years actual incarceration, to be served consecutively to the underlying convictions. Morgan appeals from his convictions.
 {¶ 2} The state's evidence established the following facts:
 {¶ 3} Darien Anderson, Stephon Brown and Donald Allen, Jr., met in downtown Dayton at approximately 12:30 a.m. on November 3, 2001. They walked to the Oregon District, where they listened to music emanating from the establishment, Ned Pepper's. At approximately 2:00 a.m., Anderson, Brown and Allen began to walk to a friend's residence on Elsmere. When the three men were walking in front of Gem City Records, individuals in a black four-door car honked at them. After driving past, the car turned around. Morgan, who was driving, and the front seat passenger ("Passenger One") called over to Anderson, Brown and Allen and soon thereafter offered them a ride home. According to Allen, he and Anderson did not want to accept the offer, but they accepted because Brown had indicated that he would accept the ride regardless of their decision. When Brown, Anderson and Allen entered the vehicle, they discovered a third person ("Passenger Two") seated in the back seat.
 {¶ 4} After leaving the Oregon District, Morgan indicated that he needed to stop at his cousin's house for something. He drove to an alley behind a white house on Danner. At the house, Morgan and Passenger One got out of the car and went around the side of the house. Upon returning, Morgan got into the front passenger seat and Passenger One became the driver. Shortly after leaving the house, the back seat passenger began to complain about wanting water, and the car returned to the house on Danner. According to Allen, Morgan and his companions all got out of the vehicle and had a brief conversation. Upon returning to the car, Morgan, again sitting in the front passenger seat, pulled out a gun, pointed it at Anderson, Brown, and Allen, and demanded everything that they had. Brown and Allen emptied their pockets and turned over their bags. Anderson gave the items in his pocket but kept his bag. Morgan and Passenger One removed Anderson from the vehicle, frisked him and took his necklace and shoes. Before leaving the alley, Passenger Two engaged the child locks on the back doors.
 {¶ 5} Morgan and his accomplices were not satisfied with what they had received, and demanded that Anderson, Allen and Brown come up with more money. Allen suggested that his father might have more money at his house on Dennison, and the group drove to Allen's father's residence. Morgan took Allen into the house at gunpoint. Allen's father was not at home, and Allen could not find any money at the residence. Before leaving the house, Morgan directed Allen to the den and ordered Allen to perform fellatio on him. Morgan then instructed Allen to put a condom on his (Morgan's) penis, following which Morgan anally penetrated Allen.
 {¶ 6} Upon leaving Allen's home, Morgan again demanded money. Anderson indicated that he had an automatic teller machine ("ATM") card at his apartment on Salem Avenue. Passenger One drove the car to that location. Instead of heading to his apartment, Anderson took Morgan to the apartment of his neighbor, Michelle Branch, while leading Morgan to believe that it was his own. After being admitted to the apartment, Anderson was able to inform Branch that he was being robbed. Branch instructed Morgan to wait outside the apartment, and Morgan complied. At that point, Anderson contacted the police. Morgan returned to the car without Anderson.
 {¶ 7} Upon returning to the car, Morgan and his companions were angry because they still had not gotten any more money, Anderson had escaped, and they assumed that the police would be called. Morgan and his accomplices took Allen and Brown to Salem Heights Park, between Park Hill Drive and Tennyson Drive. At the park, they took Allen and Brown out of the car, frisked them, and took their shoes. Allen and Brown were told to walk down a slight hill in the park and then were instructed to run. Allen and Brown contacted a friend, Paul Skinner, who picked them up at a pay telephone and took them to his residence. After approximately twenty minutes, Allen and Brown walked to the residence of another friend, Artemis Taylor. Later in the morning, Allen went to Good Samaritan Hospital where his clothing was taken as evidence and a rape kit was completed.
 {¶ 8} Morgan was initially brought to trial in February of 2002. After his first trial ended in a mistrial, Morgan was tried again on April 16-22, 2002. On appeal, Morgan presents seven assignments of error arising out of his convictions from the second trial. To facilitate our analysis, we will first address Morgan's fifth assignment of error and then consider his remaining assignments in turn.
 {¶ 9} "V. Appellant's convictions for aggravated robbery, kidnapping and rape are against the manifest weight of the evidence."
 {¶ 10} In his fifth assignment of error, Morgan claims that his convictions were against the manifest weight of the evidence. When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citing Statev. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 11} Morgan contends that he presented the greater amount of credible evidence in support of his innocence. Specifically, he argues that he presented an "iron clad alibi" that he was at another location when the crimes against Allen, Anderson and Brown occurred, and that his alibi witnesses' testimony was consistent as to where they were and what they were doing. Morgan further argues that his expert in forensic science opined that there were insufficient characteristics in the hair analysis to state that any of the unknown hair samples could have come from Morgan. Finally, Morgan notes that none of the victims testified to noticing either of his two identifying physical features, namely a decayed front tooth and a scar on his left hand
 {¶ 12} We have no problem finding extensive evidence to support the guilty verdicts on the kidnapping, aggravated robbery and rape charges. With slight variations, Anderson, Allen and Brown each testified as to the events of the morning of November 3, 2001, as set forth generally above. Other state witnesses provided corroboration for various parts of the victims' testimony. Michelle Branch testified that Anderson had come to her apartment with another male, that Anderson had shown her that he was wearing mismatched shoes and that he had told her that he was being robbed. Branch further testified that she asked the male to leave the apartment, that the individual complied, and that Anderson subsequently contacted the police. Anderson had testified that Morgan and his accomplices had previously taken his shoes and that prior to leaving the car at his apartment complex, they had given him mismatched shoes because they could not find his second shoe in the car. Allen's father testified that when he came home on November 3, 2001, he found the deadbolt to the front door was unlocked and that he later noticed a condom wrapper on the floor of his den. Allen's father further indicated that the wrapper was not the brand that he used. Paul Skinner testified that he received a telephone call from Allen, and that he went to get Allen and Brown. He testified that Allen usually carried a bag, but that neither Allen nor Brown had bags when he arrived and they were also missing their shoes. Skinner indicated that Allen and Brown stayed for twenty to thirty minutes, and then left for Artemis Taylor's home.
 {¶ 13} During the subsequent investigation, Allen, Anderson and Brown each identified Morgan as the initial driver of the vehicle who became the individual with the gun, and they identified Morgan as that man at trial. Detective Elizabeth Martinez testified that Allen identified Morgan as the man with the gun after viewing 438 photographs on the police's computer photo system, which contains photographs of individuals arrested in Montgomery County. Martinez further indicated that Anderson and Brown identified Morgan as the initial driver from an array of photographs. She testified that photo arrays contained different photographs of Morgan and that his picture was located in a different position on the two arrays.
 {¶ 14} In addition, the state presented the testimony of Daniel Bibby, a forensic scientist and supervisor of the Trace Evidence Section of the Miami Valley Regional Crime Laboratory. Bibby compared pubic and head hair found on Allen's jacket and t-shirt, which were taken into evidence at Good Samaritan Hospital, to known pubic and head hair standards taken from Morgan and Allen. Bibby conducted a hair analysis on two complete pubic hairs and two complete head hairs from Allen's jacket. He concluded that one pubic hair did not match either Allen or Morgan, that he could not include or exclude Morgan as the source for the second pubic hair, and that the two head hairs were microscopically indistinguishable from Morgan's head hair samples. As to the t-shirt, Bibby testified that, of the five unknown hairs with which he began, two were body hairs, one hair was fragmented, one hair was Allen's, and the fifth hair had the same characteristics as Morgan's hair. Bibby testified that he has compared thousands of hairs, and he further testified repeatedly, without objection, that he has always been able to differentiate between hair from different individuals. Bibby indicated that he had undergone proficiency testing on at least ten or twenty occasions, and had never been shown to be wrong in any of those tests. In his defense, Morgan presented the expert testimony of Larry Dehus, who testified that he could not, to a reasonable scientific certainty, differentiate between Allen, Morgan, and the unknown head hairs. Dehus further testified that he could not, to a reasonable scientific certainty, include Morgan as the possible donor of the unknown pubic hairs. Although Morgan provided expert testimony that contradicted Bibby's testimony, the jury was free to believe the testimony provided by Bibby and thus to credit his hair analysis over Dehus'.
 {¶ 15} Morgan asserts that he offered a credible "iron clad" alibi. He testified that he was with Steven North, Philip Morgan ("Philip Morgan"), and James (aka Billie) Clyburn and that he stayed at the home of his cousin, Stephanie Strickland In particular, Morgan testified that he left his aunt's house at approximately 7:00 p.m., with North, Philip Morgan and Clyburn. They went to the Main Drive-Thru and bought some Black and Mild cigars. They then went to the residence of Morgan's uncle, John Earl Morgan, but found that he was not at home. The group traveled to Rut's Drive-Thru to get more Black and Milds and Swishers, following which they drove to the McDonald's where Strickland worked to get the key to her apartment. The group played video games at Strickland's apartment until approximately 11:00 p.m., at which time they picked Strickland up from her job and returned with her to her apartment. Morgan testified that they left Strickland's apartment on one occasion at 1:30 a.m. to buy more Black and Milds. Otherwise, they spent the entire morning of November 3 at Strickland's apartment. With some variation, North, Philip Morgan and Clyburn each provided testimony regarding their activities during the morning hours of November 3, 2001, which supported Morgan's alibi. Each of these witnesses testified that the night of November 2 into November 3 was memorable, because Strickland's husband had been arrested on November 2, 2001. Strickland likewise testified that Morgan, Clyburn and Philip Morgan had picked her up at work and returned to her apartment with her. She testified that she had gone to bed at approximately 2:30 a.m., and that Morgan had been there.
 {¶ 16} Although the jury could have credited Morgan's testimony and that of his alibi witnesses, the jury was not required to do so. We note that Philip Morgan, Clyburn and North each testified that they had been drinking beer and smoking marijuana on the night in question. In addition, although Philip Morgan was able to recall the events of the morning of November 3, 2001, he did not have any memory of the rest of November 3, 2001, nor November 4, 2001. North and Clyburn likewise had no memory of their activities after returning home from Strickland's apartment. Thus, although Philip Morgan, Clyburn, North and Morgan all testified that they were together during the times in question and that they were not at the places where the offenses against Allen, Anderson and Brown took place, a reasonable jury could have found that their testimony was not credible, particularly in light of the fact that Allen, Anderson and Brown each independently identified Morgan as the individual with the gun. The trial court's credibility determinations are entitled to great deference by a reviewing court. See State v. Sherrill
(Jan. 28, 2000), Montgomery App. No. 17359.
 {¶ 17} Morgan claims that none of the victims testified to noticing his decayed front tooth and the scar on his left hand, both of which are identifying features. Brown testified that the individual with the gun had a "chipped tooth or something on his tooth or something." In addition, Martinez testified that she noticed a defect on Morgan's teeth but that he had to bare his teeth in order for her to see it. Based on the record, we cannot conclude that the jury "clearly lost its way." We therefore conclude that Morgan's convictions for robbery, rape and kidnapping were not against the manifest weight of the evidence.
 {¶ 18} Morgan's fifth assignment of error is overruled.
 {¶ 19} "I. The trial court erred in allowing the state to present evidence of appellant's silence."
 {¶ 20} In his first assignment of error, Morgan claims that the trial court erred in allowing prosecutors to inquire about a process at the Montgomery County Jail whereby an inmate could make contact with a police officer. Morgan contends that he had a constitutional right to remain silent and that this line of questioning by the state suggested that his silence in jail after receiving Miranda warnings was probative of his guilt and undermined his alibi defense. He argues that "[i]t was fair game for [the prosecutor] to question [Morgan] on what he said and what he wrote after being `Mirandized' by detectives. It was not fair game for [the prosecutor] to inquire of [Morgan] regarding his silence while languishing in jail." In response, the state asserts that Morgan waived his Miranda rights and gave statements to Detectives Martinez and Olinger. It argues that when an accused chooses to talk, it is proper to inform the jury that he refused to give details to corroborate his alibi.
 {¶ 21} It is well-established that the use for purposes of impeachment of an accused's silence at the time of arrest and after receiving Miranda warnings violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Doyle v. Ohio, 426 U.S. 610, 619, 96 S.Ct. 2240,49 L.Ed.2d 91. However, where a defendant chooses not to exercise his right to silence, he has not relied upon the Miranda
warnings and the promise that his silence cannot be used against him. State v. Osborne (1977), 50 Ohio St.2d 211, 4 O.O.3d 406, 364 N.E.2d 216; State v. Gillard (1988),40 Ohio St.3d 226. "If a defendant voluntarily offers information to police, his toying with the authorities by allegedly telling only part of his story is certainly not protected by Miranda or Doyle."Osborne, 50 Ohio St.2d at 216.
 {¶ 22} In the present case, Morgan initially did not exercise his right to remain silent but, rather, gave a statement to the police on November 23, 2001, the date that he was taken into custody. Morgan testified that he informed Detective Martinez that he was with his cousins on November 2, 2001, and into November 3, 2001. He further testified that he informed Martinez that he lived with his aunt, Deborah North, and that he was at the home of his cousin, Stephanie Strickland, on the night in question. He indicated that he told her that he was in a van with his cousins, that they drove to his uncle's house and then to a drive-thru. On November 26, 2001, Morgan spoke with Detective Olinger. Detective Olinger testified that Morgan said that his family usually went out of town for church, and that Morgan wrote out a statement indicating that he did not know Brown, Allen or Anderson, that he had never had sex with a male, and that he did not see the victims on November 3, 2001. Morgan was not interrogated further nor did he volunteer any further statements prior to trial.
 {¶ 23} Because Morgan chose to give statements to the police, both orally and in writing, the state could properly question Morgan during the trial about any inconsistencies in his story and his failures to provide a complete statement of his activities to the police during his interrogations. However, in our judgment, the state overstepped its bounds when it questioned Morgan about his subsequent silence and his failure to contact police while awaiting trial at the Montgomery County Jail. Although Morgan clearly opted not to invoke his right to silence when Martinez and Olinger questioned him, he did not waive his right to silence indefinitely. Once the interrogations by Martinez and Olinger had completed and Morgan returned to jail, Morgan again had the ability to invoke his Miranda rights. SeeState v. Stephens (1970), 24 Ohio St.2d 76, 81, 263 N.E.2d 773
("the right to remain silent does not require that the accused's silence must be total from its original invocation until the jury's final verdict."); State v. Thompson (1987),33 Ohio St.3d 1, 514 N.E.2d 417; State v. Charlton, Lorain Co. App. Nos. 02CA008048, 02CA008049, 2003-Ohio-2631. Just as a prosecutor may not comment on an accused's refusal to testify, even though he may have previously made statements to the police, Thompson,
supra, the state may not comment upon nor question an accused about his failure to volunteer information while awaiting trial. Thus, in the present case, the prosecutor's questions regarding Morgan's ability to contact detectives in jail and his failure to do so were improper.
 {¶ 24} The state asserts that the purpose of the disputed line of questioning was to demonstrate to the jury that Morgan had had an opportunity to give the details of his alibi to the police even though he was incarcerated. It notes that the questions were asked after Morgan had testified that he had been in jail since the day after Thanksgiving and had not seen his family since that time. In our judgment, Morgan's testimony did not open the door to the prosecutor's questioning. We find no evidence that defense counsel "invited" the error of which Morgan complains.
 {¶ 25} "Where constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." State v. Williams
(1983), 6 Ohio St.3d 281, paragraph six of the syllabus. Upon review of the record, we find substantial evidence to support the convictions. In addition, the prosecuting attorney properly elicited testimony that Morgan chose not to provide complete details of his activities to detectives during his interrogations, even though he twice elected to provide statements to them. Thus, even though we conclude that the prosecutor wrongfully inquired about Morgan's subsequent silence in jail, we conclude that the prosecutor's comments were harmless beyond a reasonable doubt.
 {¶ 26} Morgan's first assignment of error is overruled.
 {¶ 27} "II. Prosecutorial misconduct during trial deprived appellant of a fair trial."
 {¶ 28} Morgan claims that the state engaged in prosecutorial misconduct on seven occasions during the trial. In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Jones,90 Ohio St.3d 403, 420, 2000-Ohio-187, 749 N.E.2d 300, citing State v.Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting Smith v.Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947,71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See State v. Loza (1994),71 Ohio St.3d 61, 78, 1994-Ohio-409, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial.Darden v. Wainwright (1986), 477 U.S. 168, 106 S.Ct. 2464,91 L.Ed.2d 144.
 {¶ 29} First, Morgan asserts that during the state's opening statement, the prosecutor overstated the conclusion of a forensic scientist who conducted a hair comparison analysis. Specifically, he challenges the following comment by the state:
 {¶ 30} "Now, D.N.A. was attempted and D.N.A. — D.N.A. analysis is gonna come in here. They didn't have the root, so they could not do D.N.A. So, it's not gonna be that situation to four billion, but the Miami Valley Regional Crime Lab al — technician, Dan Bibby's gonna come in here. He's gonna tell ya' about hair comparisons and all the characteristics that he looks at. And how that hair matches the Defendant's. Or is identical, excuse me, to the Defendant's. . . ."
 {¶ 31} Defense counsel objected to the prosecutor's representation that Bibby was expected to testify that the hair was identical. The trial court overruled the objection, indicating that if the evidence did not match the opening statement, defense counsel had "every right to cram it down her throat later in the case."
 {¶ 32} The state acknowledges that the prosecutor's use of the word "identical" was not a fair characterization of Bibby's expected testimony. However, upon review of the record, we find no indication that this overstatement prejudicially affected Morgan's rights. Prior to the delivery of opening statements, the trial court had instructed the jury that the opening statements were not evidence but, rather, were merely previews of what each side believed that the evidence would show. Upon presenting his opening statement, Morgan's trial counsel immediately stated that Bibby would not testify that the hairs were identical. Later, during Bibby's discussion of his comparison of the unknown head hair to Morgan's, he specifically testified that he would not
say that the hairs were identical or definitely came from the same head, as indicated by the following exchange:
 {¶ 33} "Q: Are you saying this is Todd Martin's hair?
 {¶ 34} "A: No, sir.
 {¶ 35} "Q: Okay. So you're not saying they're identical or this definitely came from the same head?
 {¶ 36} "A: I'm — I know of no one who would say that, sir.
 {¶ 37} "Q: No one . . .
 {¶ 38} "A: Uh . . .
 {¶ 39} "Q: . . . could say it was identical?
 {¶ 40} "A: Not anyone I know unless they do D.N.A."
 {¶ 41} Instead, Bibby testified that the unknown hairs were microscopically indistinguishable from the standards that he had received from Morgan. In our judgment, the trial court's instruction regarding opening statements and Bibby's clear testimony that the unknown head hairs were microscopically indistinguishable from Morgan's but that he could not say they were identical cured any overstatement by the prosecutor.
 {¶ 42} Second, Morgan claims that the prosecutor wrongfully solicited conclusions from her expert that exceeded what the law permits, i.e., that a specific hair sample came from Morgan. Contrary to Morgan's assertion, Bibby did not directly testify that three of the unknown hairs found on Allen's clothing came from Morgan. Rather, he testified that those unknown hairs were microscopically indistinguishable from Morgan's, rendering them consistent with having a common origin. We note that defense counsel did not object to this testimony and, regardless, we find no error in the admission of this expert testimony. See State v.Graham (Jan. 10, 2001), Medina App. No. 3052-M (discussing admissibility of hair analysis and whether microscopic hair comparison analysis is sufficiently reliable to determine whether a specific hair sample came from a specific individual, to the exclusion of others).
 {¶ 43} Morgan also challenges the solicitation of Bibby's testimony that, in his experience, he has not come across two people having the exact same hair characteristics. We recognize that this testimony, in conjunction with his testimony that three unknown hairs were indistinguishable microscopically from Morgan's, could lead a jury to believe that the unknown hairs were, in fact, Morgan's. However, on cross-examination, Bibby expressly testified that he could not identify the unknown hairs as coming from Morgan without a D.N.A. analysis. Moreover, the jury could easily rely primarily on the eyewitness identifications of Morgan as the individual with the gun as the basis for concluding that Morgan raped Allen. Thus, even assuming that the prosecutor improperly inquired about Bibby's experience in distinguishing the hair from different individuals, it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct.
 {¶ 44} Third, Morgan claims that the prosecutor acted in bad faith when she repeated a question which had previously been deemed improper. During her direct examination of Detective Martinez, the prosecutor asked:
 {¶ 45} "Q: "If you hold a weapon, a gun in your left hand, can you demonstrate for us whether or not a person — or what the likelihood would be that you'd be able to see that scar?"
 {¶ 46} "A: In — in . . .
 {¶ 47} "Q: On the Defendant's hand
 {¶ 48} "A: In a left hand?
 {¶ 49} "Q: Mmm Hmm."
 {¶ 50} Defense counsel objected on the ground of speculation, and the objection was sustained. On redirect examination, the prosecution again inquired about whether the scar would be seen, asking: "The scar that you were shown the photographs of on the Defendant's left hand, do you know if holding a gun in that left hand, do you know if that would hide the scar?" Defense counsel did not object to this question, and the detective responded affirmatively.
 {¶ 51} We find no error in the prosecutor's rephrased question. The first question asked the detective to speculate as to the likelihood that others would see a scar. The second question removed the speculative aspects and asked the detective if, after viewing Morgan's scar, holding a gun in the left would hide the scar. The rephrased question was relevant, specific to the evidence presented at trial, and eliminated the objectionable aspects of her initial question. We find no bad faith on the part of the prosecutor based on this conduct.
 {¶ 52} Fourth, Morgan asserts, as in his first assignment of error, that the prosecutor committed misconduct by eliciting testimony to show that Morgan could have contacted police while at the Montgomery County Jail but declined to do so. As previously discussed, we conclude that this line of questioning was improper. However, for the reasons set forth above, we conclude that this brief exchange between the prosecutor and Morgan did not render the trial fundamentally unfair.
 {¶ 53} Fifth, Morgan claims that the prosecutor engaged in misconduct when she asked Morgan during cross-examination whether Philip Morgan, North, or Clyburn had told Martinez and Olinger their story prior to the trial. Defense counsel did not object to those questions, thus Morgan has waived all but plain error.State v. Ballew (1996), 76 Ohio St.3d 244, 254, 1996-Ohio-81,667 N.E.2d 369. We find no error, plain or otherwise, in the prosecutor's questioning about whether an alibi witness told an investigating officer prior to trial that he or she was with the accused. In State v. DeLeon (May 25, 2001), Montgomery Co. App. No. 18114, we stated that "it was not improper for the prosecutor * * * to bring out the fact that [the alibi witness] never told anyone investigating the case — the police or prosecutors, for example — that [the accused] was with her at the time of the shooting." Thus, we find no prosecutorial misconduct in this line of questioning.
 {¶ 54} Sixth, Morgan claims that the prosecutor improperly inquired as to the date that the Notice of Alibi was filed. The state acknowledges that the cases cited by Morgan have held that the prosecuting attorney may not present evidence of the date the notice of alibi was filed, on the grounds that the failure to file such notice promptly is not probative of guilt and because such evidence relates to the defendant's prior silence. State v.Tolbert (1990), 70 Ohio App.3d 372, 381, 591 N.E.2d 325; Statev. Sims (1982), 3 Ohio App.3d 331, 334, 445 N.E.2d 245; see, also, State v. Elersic, Lake Co. App. No. 2000-L-145, 2002-Ohio-2945, ¶ 27. The state notes, however, that the inappropriate questioning did not result in the reversal of the convictions in either case. The state thus asserts that the prosecutor's question about the date of filing constitutes harmless error.
 {¶ 55} Although we agree with Morgan that the prosecuting attorney's question regarding the date that the notice of alibi was filed was improper, we find no basis to conclude that the question affected a substantial right of appellant. As noted by the state, the notice of alibi was not mentioned during closing arguments, and the jury was not led by prosecutors to draw any inferences from the date of its filing. See Sims, supra. Moreover, the prosecutor had properly adduced evidence, through other questions, that neither Morgan nor his alibi witnesses had presented their complete stories to detectives prior to trial. Thus, any inference that might have been drawn from the date of filing the notice of alibi was cumulative of the evidence properly presented at trial. See Elersic, 2002-Ohio-2945, ¶ 28. We are thus persuaded, beyond a reasonable doubt, that the question regarding the date that the Notice of Alibi was filed was harmless error.
 {¶ 56} Finally, Morgan asserts that the prosecuting attorney wrongfully inquired about his contact with his father, who was housed at the Montgomery County Jail, at Muslim services. Morgan contends that this evidence was irrelevant and was intended to demonstrate that the accused "was a bad guy." The state responds that the prosecutor was attempting to impeach Morgan's testimony regarding his long-time association with the Gospel Truth Mission by bringing up his inconsistent conduct, i.e., his attendance at Muslim services while in jail. Morgan's trial counsel did not object to this line of questioning, and we find no plain error in the prosecuting attorney's conduct. Morgan testified that he attended the services to see his father and, upon reviewing the record in its entirety, there is no basis to conclude that testimony regarding his attendance at Muslim services would have altered the result of his trial.
 {¶ 57} Having found that none of the asserted errors prejudicially affected Morgan's substantial rights, Morgan's second assignment of error is overruled.
 {¶ 58} "III. Appellant was denied his right to a fair trial when he received ineffective assistance of counsel in violation of the fifth, sixth and fourteenth amendments to the United States Constitution."
 {¶ 59} In his third assignment of error, Morgan contends that he received ineffective assistance of counsel in that his trial counsel gave a deficient opening statement, failed to object to Bibby's conclusions, did not object to the rephrased question to Martinez regarding whether holding a gun in the left hand would hide Morgan's scar, failed to object to questions about Morgan's and Morgan's father's religious practices at the Montgomery County Jail, and was confused as to how to impeach witnesses with prior inconsistent statements from the first trial.
 {¶ 60} In order to demonstrate ineffective assistance of counsel, Morgan must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance, i.e., that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373; Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See Strickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Seeid.; State v. Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 {¶ 61} In our judgment, the record fails to demonstrate that Morgan was denied effective assistance of counsel. As with Morgan's assertions of prosecutorial misconduct, we find no basis in the record to conclude that Morgan was prejudiced by his counsel's failure to object to Bibby's conclusions, the rephrased question to Martinez, or the questions about Morgan's and his father's attendance of Muslim church services while in jail. As for defense counsel's apparent confusion regarding the proper method of introducing prior inconsistent statements, the trial court and the prosecutor instructed Morgan's trial attorney during sidebar conferences as to the appropriate method of introducing prior inconsistent statements. As a result, the jury was presented with those prior inconsistent statements. We therefore find no prejudice resulting from his alleged confusion.
 {¶ 62} Morgan contends that his trial counsel's opening statement was deficient in that he did not mention his alibi defense. He asserts that his counsel unreasonably stated that the evidence would show that the victims came up with different stories for various reasons, and that it was impossible for the events to have occurred as portrayed by Allen, Anderson and Brown. "[C]ounsel has wide latitude in deciding how best to represent a client," and accordingly, trial counsel should be awarded substantial deference regarding his tactical decisions in presenting his arguments to the jury. See Yarborough v. Gentry
(2003), 124 S.Ct. 1, 4. Morgan's defense counsel gave a brief opening statement, in which he made three points: (1) that the state's forensic expert would not be able to say that the hairs found on Allen's clothes were identical to Morgan's; (2) that there are numerous inconsistencies in the victims' stories, making it impossible for the crimes to have occurred as Allen, Anderson and Brown say they did; and (3) that Morgan "didn't do it. He wasn't there." Although Morgan's trial counsel could have opted to detail the anticipated inconsistencies in the victims' stories and the anticipated alibi testimony, it was reasonable trial strategy for him to raise those arguments during his opening statement and then wait until closing arguments to elaborate upon the facts presented at trial in support of those arguments. Accordingly, Morgan's ineffective assistance of counsel argument is without merit.
 {¶ 63} Morgan's third assignment of error is overruled.
 {¶ 64} "IV. Cumulative errors during trial deprived appellant of a fair trial."
 {¶ 65} Under Morgan's fourth assignment of error, he argues that the cumulative weight of the errors presented in his first, second and third assignments of error denied him a fair trial. As discussed above, Morgan's trial was not without error. However, none of the errors that we have identified were prejudicial to Morgan. Although the Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus may warrant the reversal of his conviction,State v. DeMarco (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256, paragraph two of the syllabus, upon a complete review of the record, we cannot conclude that prejudicial error exists in this case.
 {¶ 66} The fourth assignment of error is overruled.
 {¶ 67} "VI. The trial court erred in sentencing appellant to two nine year concurrent sentences on counts five and six of said indictment because these kidnapping charges are felonies of the second degree."
 {¶ 68} In his sixth assignment of error, Morgan claims that the trial court improperly imposed a nine year sentence on the two counts of kidnapping but releasing the victim in a safe place unharmed, in violation of R.C. 2905.01(A)(2). He asserts that under R.C. 2905.01(C), if the offender released the victim in a safe place unharmed, the kidnapping is a second-degree felony, for which the basic prison term ranges from two to eight years. See R.C. 2929.14(A)(2). In response, the state concedes that the trial court should have considered Counts Five (kidnapping of Stephon Brown) and Six (kidnapping of Darien Anderson) to be felonies of the second degree, because the indictment stipulated that Brown and Anderson were released in a safe place and unharmed. The state further agrees that the case should be remanded for re-sentencing on Counts Five and Six. We concur. Counts Five and Six will be remanded for re-sentencing.
 {¶ 69} Morgan's sixth assignment of error is sustained.
 {¶ 70} "VII. The trial court erred in accepting a jury verdict where all twelve jurors did not make a unanimous finding on the gun specification."
 {¶ 71} In his seventh assignment of error, Morgan argues that the trial court erred in accepting the finding of a firearm specification in Count Eight, because not all twelve jurors signed the verdict form for that specification. As argued by Morgan, and conceded by the state, Ohio Crim. R. 31 requires that the verdict be unanimous, set forth in writing, signed by all jurors, and returned by the jury to the judge in open court. The state agrees that the verdict on the firearm specification for Count Eight fails to meet the requirements of Ohio Crim. R. 31. Upon review of the verdict, we agree that the trial court erred in accepting a non-unanimous written verdict on the firearm specification in Count Eight.
 {¶ 72} The governments argues (and Morgan essentially agrees) that Morgan need not be re-sentenced, because the firearm specifications were merged into one, and Morgan was sentenced to serve one three-year term of incarceration. In light of the fact that the firearm specifications were merged and that Morgan received only one three-year sentence for all of the firearm specifications combined, we likewise conclude that the erroneous finding of a firearm specification for Count Eight was harmless and had no impact on Morgan's actual sentence.
 {¶ 73} Morgan's seventh assignment of error is sustained. The conviction on the firearm specification for Count Eight will be vacated, but no re-sentencing is required due to this erroneous conviction.
 {¶ 74} The judgment of the trial court will be affirmed in part, reversed in part, vacated in part, and the case will be remanded for further proceedings. Specifically, the sentences on Counts Five and Six will be reversed and those counts will be remanded for re-sentencing. The conviction on the firearm specification for Count Eight will be vacated. In all other respects, the convictions and sentences will be affirmed.
Brogan, J. and Grady, J. concur.